903 F.2d 312
 59 USLW 2055
 In re RAMU CORPORATION, Petitioner.
UNITED STATES of America, Petitioner,
v.
6600 NORTH MESA, EL PASO, TEXAS, Respondent.
In re Ivonne DELGADO DE MUNOZ, Luis Delgado Avalos, Beatriz
Varela Delgado, and Rafael Munoz Telles, Petitioners.
UNITED STATES of America, Petitioner,
v.
REAL PROPERTY WITH RESIDENCE LOCATED AT 1070 GARDNER ROAD,
EL PASO, TEXAS, With all its Furnishings and Appurtenances
and Improvements Thereon and Real Property with Residence
Located at 6636 Gato Road, El Paso, Texas, with all its
Furnishings and Appurtenances and Improvements Thereon, Respondents.
 Nos. 90-8151, 90-8152.
 United States Court of Appeals,
Fifth Circuit.
 May 29, 1990.
 
 Bernard J. Panetta, II, Mary Stillinger, Caballero, Panetta, Ortega, El Paso, Tex., for Ramu Corp.
 Sara Criscitelli, U.S. Dept. of Justice, Appellate Section, Washington, D.C., Steve Jurecky, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., El Paso, Tex., for respondents.
 Appeal from the United States District Court for the Western District of Texas.
 On Petitions For Writ of Mandamus
 Before POLITZ, GARWOOD and JOLLY, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 The petitioners for mandamus, various individuals and a corporation, are claimants of certain real property in El Paso, Texas that is the subject of two civil forfeiture actions. They request that we lift a comprehensive and potentially lengthy stay of all proceedings in the cases. The seized properties are the residences of some of the petitioners and a shopping center. None of the claimants is under indictment, nor is any of them alleged to have engaged in illegal activities; yet they have been effectively dispossessed of their homes and denied the use of their business without a hearing. Their property has been seized on the grounds that an individual, to whom some of them are related, enabled them to purchase the properties through his extensive narcotics trafficking. Yet he has not been indicted either. The government contends, however, that a stay in these two cases is necessary pending the outcome of a drug conspiracy case in California, in which, we reiterate, neither the claimants nor the alleged drug trafficker is named. Because we are convinced that the government has not satisfied the statutory requirements for this all inclusive stay, we grant in part the claimants' petitions and direct the district court to reconsider the stay and to consider claimants' pending motion to dismiss the forfeiture complaint against the residences.
 
 
 2
 * Although the facts underlying both actions are similar, the cases arrive in different procedural postures. Because there is no evidentiary record or findings of fact, our analysis depends entirely upon the pleadings, so we review the procedural history of both cases in some detail.
 
 
 3
 * On October 16, 1989 the United States filed a verified complaint in the Western District of Texas, seeking the forfeiture of two adjacent parcels of real property in El Paso (the "residences case"). A "verified complaint" commences an in rem action under the Supplemental Rules for Certain Admiralty and Maritime Claims. See Rule C(2). Although these were civil actions, the forfeiture statute under which they were brought required that they proceed under the Supplemental Rules, rather than the Federal Rules of Civil Procedure. See 21 U.S.C. Sec. 881(b) (West 1990). The complaint alleged that the properties, two residences, outbuildings and surrounding land, constituted proceeds traceable to sales of illegal drugs, and thus were forfeitable under 21 U.S.C. Sec. 881(a)(6).[1] One parcel of land, 1070 Gardner Road, consisted of eight lots, including one house with outbuildings. The warranty deed, attached to the complaint, identifies four owners of the lots: Luis Delgado Avalos and Beatriz Varela Delgado (four lots), whose address is given in Juarez, Mexico; Rafael Munoz Telles (three lots), whose address is given in El Paso; and Ivonne Delgado de Munoz (one lot), whose address is also in El Paso. The other parcel, a house at 6636 Gato Road, is owned by Rafael Munoz Telles. The two properties are alleged to be worth over $500,000; neither has any liens or mortgages recorded against them.
 
 
 4
 The complaint averred that agents of the Drug Enforcement Administration believed that the properties were purchased with proceeds from drug transactions because a relative of the property owners is allegedly a major drug trafficker. The complaint described the arrest and indictment in California of a James McTague, on charges of conspiracy to import nineteen tons of cocaine that was found in a warehouse in Sylmar, California. It recounted that, when arrested, McTague gave statements implicating himself and others in the conspiracy. Among those implicated was one Rafael Munoz Talavera who, according to a DEA agent, is "of record" with the DEA, and who, according to McTague, was "in charge of all transportation" of the cocaine.
 
 
 5
 Rafael Munoz Talavera is the husband of Ivonne Delgado de Munoz and the son of Rafael Munoz Telles. The complaint states:
 
 
 6
 James McTague also told DEA Special Agent Jim Capra that Rafael Munoz had been the person in charge of the transportation from Mexico of all the cocaine (which he related included a total of about 60 tons during the past year), that had gone through the warehouse in Sylmar, California. McTague also told Special Agent Capra that the money for the cocaine had traveled back the same route through Rafael Munoz to Munoz' Colombian connection. During approximately a year period, Rafael Munoz Telles (the father of Rafael Munoz), bought the Respondent property as follows: Lot 2 on November 2, 1987 for $64,520.00, Lots 3, 4, 6 and 7 on November 25, 1987 for $179,550.00, Lot 9 on April 12, 1988 for $35,000.00, Lot 8 on May 5, 1988 for $35,000.00, Lot 1 on August 24, 1988 for $100,000.00 and Lots 8B on August 29, 1988 for $120,195.19. He paid Lawyers Title of El Paso with a cashier's check for each purchase. The lots were placed in various names (nominees), but the lots are all included in the same compound area as the house on Lot 2, which is where Rafael Munoz, Ivonne Delgado De Munoz (his wife), and his children live.
 
 
 7
 Attached to the complaint was a declaration by Darrell Spain, a DEA Special Agent, which stated: "I have read the contents of the foregoing complaint for forfeiture, and the statements contained therein are true to the best of my knowledge and belief."[2] The only other evidence were the deeds for the subject property.
 
 
 8
 Simultaneously with the filing of the complaint, the government moved for permission to have the U.S. Marshal seize the property. The next day the court granted the government's motion ex parte, and the following day issued a warrant for the property's arrest.[3]
 
 
 9
 A month later, on November 16, the government filed another verified complaint alleging the same relationship between Rafael Munoz Talavera and the California cocaine conspiracy, but in this case the defendant was an El Paso shopping center, owned by a corporation which the government alleged was used to disguise proceeds from drug transactions. The shopping center is worth approximately $4 million, and has a lien against it for a note held by an insurance company for approximately $3.2 million. This complaint states:
 
 
 10
 The Respondent [property] was purchased from proceeds from the distribution of illegal drugs in violation of 21 U.S.C. Sec. 841. Rafael Munoz knew that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity described above, for the following reasons:Rafael Munoz Talavera negotiated the purchase of the respondent from on or about May 1, 1989 (when he signed the Earnest Money Contract) through May 9, 1989, when he selected his father, Rafael Munoz Tellez, to be the president, and Juan Uribe to be vice-president and registered agent of the RAMU Corporation to conceal the identity of the true owner, Rafael Munoz Talavera, and he then, in fact, purchased the Respondent by bringing a cashier's check in the amount of $1,214,550.06 on Banco Del Atlantico's account at Texas Commerce Bank payable to Lawyers Title to close the transaction on May 9, 1989.
 
 
 11
 Rafael Munoz Talavera has continued to act as the owner through November.
 
 
 12
 Attached to this complaint was a declaration by an IRS Special Agent assigned to the case, identical to that of DEA agent Spain in the first case, averring that the statements in the complaint were true.
 
 
 13
 On November 20, the claimants, record titleholders of the residential property, filed their notice of claim. They stated that the property had not been obtained with the proceeds from drug transactions and that they were innocent, good faith owners. The same day the claimants also filed two notices of deposition. In the first they sought to depose three DEA agents, including the agent who had stated that Munoz Talavera was "of record" with the DEA and the agent who verified the complaint, and the Deputy U.S. Marshal. They requested subpoenas duces tecum for records connecting the claimants or Rafael Munoz Talavera with illicit activities or the proceeds therefrom. The deposition was to be held in an El Paso court reporter's office. The second notice sought to depose the claimants themselves at the office of an attorney in Juarez, Mexico.[4] Meanwhile, on November 27 the court issued a warrant for the arrest of the shopping center and the property was seized by the Marshal.[5]
 
 
 14
 On November 28, 1989, the government moved for a stay in the residences case, "until the disposition of the related criminal case now pending in the Central District of California," or a protective order, under Rule 26(c)(1) of the Fed.R.Civ.P., until the disposition of the related criminal investigation. The motion stated:
 
 
 15
 The factual basis supporting the criminal prosecution and the factual basis supporting the Government's civil complaint in the instant cause stem from the same transactions. It is Petitioner's position that public disclosure of information related to the criminal cause would circumvent the rules of criminal procedure and could compromise the related pending criminal action.
 
 
 16
 In an accompanying memorandum of law, the government argued that the claimants were attempting to avoid the discovery limits facing criminal defendants through use of the more liberal discovery available in the civil forfeiture proceedings.[6] The government also moved for a protective order to prevent the taking of any depositions outside El Paso, particularly in Mexico.
 
 
 17
 On December 7 the claimants filed an opposition to the government's motion for a stay or protective order, and a motion to dismiss. The claimants argued that a stay was inappropriate because it indefinitely deprived them of the use of their property without any of them, or even Munoz Talavera, having been indicted, and denied them any opportunity to recover their property. They contended that if they were barred from discovering the evidence connecting their property with illegal activity, they would have no means of contesting the seizures. Their motion to dismiss was brought under both Rule 12(b)(6) of the Fed.R.Civ.P. and Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims. It contended that the complaint failed to state a claim upon which relief could be granted, because it did not satisfy the particularity requirements for pleading under the Supplemental Rules.[7]
 
 
 18
 On December 11, 1989 the district court granted all of the government's motions. It stayed proceedings in the residences case "pending the resolution of criminal case CR-89-874-TJH in the Central District of California."[8] It also ordered that all depositions in the case be taken in El Paso, and that no depositions be taken "until after resolution of Petitioner's Motion for Stay of Proceedings."[9] The district court did not rule on claimants' motion to dismiss, which remains pending.
 
 
 19
 The claimant Ramu Corporation filed its notice of claim with respect to the shopping center on December 22. As in the other case, it sought to depose government agents, here the IRS special agent whose declaration accompanied the pleading, concerning any information she had that would connect the claimant, or Rafael Munoz Talavera or the property with the proceeds of illegal activity. It also sought to depose Rafael Munoz Telles, its president, for its own benefit. As in the other case, the government moved for a stay or a protective order. On January 10, 1990, the court entered a stay and a protective order in the shopping center case identical to those it had entered in the residences case. On March 15, 1990, the claimants filed petitions for mandamus in both cases, requesting that the district court be ordered to lift the stays and the protective orders, and to hold a hearing on the motions for stays and protective orders.
 
 B
 
 20
 Because of the novel and important issues this case presents, we requested a response from the government to the claimants' petitions for mandamus. Specifically, we asked the government to address the need for seizure rather than some less drastic means to protect its interest in the properties. After the government's response, and a reply by petitioners, we requested oral argument on the matter. Following able argument, and our thorough consideration of the matter, we now grant in part the petitions for mandamus for the reasons set forth below.
 
 II
 
 21
 We start with the observation, now almost trite but nevertheless a fundamental premise, that mandamus is an extraordinary remedy, not to be granted lightly. Ex Parte Fahey, 332 U.S. 258, 259-60, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041 (1947); Kerr v. United States District Court, 426 U.S. 394, 402-03, 96 S.Ct. 2119, 2123-24, 48 L.Ed.2d 725 (1976). It "is awarded, not as a matter of right, but in the exercise of sound judicial discretion." Southern Pacific Transp. Co. v. San Antonio, Tex., 748 F.2d 266, 270 (5th Cir.1984) (citing Duncan Townsite Co. v. Lane, 245 U.S. 308, 311, 38 S.Ct. 99, 101, 62 L.Ed. 309 (1917)). Because it interposes an appellate court in a matter pending before a lower court, that is presumed to be more familiar with the circumstances of the case, a petitioner's right to the writ must be "clear and indisputable." Kerr, 426 U.S. at 403, 96 S.Ct. at 2124. Although it may obviate the need for improper or unwarranted proceedings, it cannot be used as a substitute for appeal, even when hardship may result from delay or an unnecessary trial. Schlagenhauf v. Holder, 379 U.S. 104, 110, 85 S.Ct. 234, 238, 13 L.Ed.2d 152 (1964).
 
 
 22
 Mandamus has "traditionally been used in federal courts only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967). It is "available only where there is a clear and indisputable abuse of discretion or usurpation of judicial power by the trial court." In re Cajun Elec. Power Co-op, Inc., 791 F.2d 353, 365 (5th Cir.1986) (citing Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34-36, 101 S.Ct. 188, 189-91, 66 L.Ed.2d 193 (1980)).
 
 
 23
 The circumstances under which these petitioners seek mandamus, however, are somewhat less foreboding than the usual case. Because the district court has made no findings and held no hearing, it can lay claim to no greater familiarity with the matter than can be gleaned from the pleadings.[10] These are all before us. Because the action of the district court that petitioners challenge is a stay, potentially of lengthy duration, there is no interruption with ongoing proceedings below. Moreover, the statute that the government contends authorized the stay has received virtually no judicial construction. The statute's terms demand that certain elements be found before a stay may be granted, yet the court below, in its one sentence grant of the government's motion, made no written findings that these elements existed.
 
 
 24
 Finally, the consequence of the district court's action is more than simply delay or cost. It is the deprivation of the petitioners' use of their property, including their residence, for what may be a very long time, without their having had an opportunity to know the evidence against them, challenge it or even have a hearing. These petitioners have not been indicted, nor are they even alleged to have engaged in illegal activities. At most, they are related to someone who is alleged to have engaged in illegal activities, yet he himself is unindicted. Under these circumstances, we conclude that this matter is one of those extraordinary cases in which mandamus may be considered. We next examine whether the petitioners have shown that their right to the writ is "clear and indisputable."
 
 III
 
 25
 The stay of a pending matter is ordinarily within the trial court's wide discretion to control the course of litigation, which includes authority to control the scope and pace of discovery. Matter of Evangeline Refining Co., 890 F.2d 1312, 1320 (5th Cir.1989); Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir.1979). This authority has been held to provide the court the "general discretionary power to stay proceedings before it in control of its docket and in the interests of justice." McKnight v. Blanchard, 667 F.2d 477, 479 (5th Cir.1982). Even discretionary stays, however, will be reversed when they are "immoderate or of an indefinite duration." McKnight, id.
 
 
 26
 In this case, moreover, the inherent discretion of the trial court to control the course of litigation has been explicitly circumscribed by statute. 21 U.S.C. Sec. 881(i) provides:
 
 
 27
 (i) Stay of civil forfeiture proceedings
 
 
 28
 The filing of an indictment or information alleging a violation of this subchapter or subchapter II of this chapter, or a violation of State or local law that could have been charged under this chapter, which is also related to a civil forfeiture proceeding under this section shall, upon motion of the United States and for good cause shown, stay the civil forfeiture proceeding.
 
 
 29
 (Emphasis supplied). The district court did not refer to this statute in its orders, and the government never referred to this statute in its pleadings or motions in the district court. Thus, there is no indication in the record that the statute was even considered. The plain language of the statute requires that two elements be found in order to grant the stay: (1) that forfeiture proceedings be "related to" a drug offense for which there has been an indictment, and (2) that the government show "good cause" for the stay. Given the absence of conclusive record evidence demonstrating that either of these elements was satisfied, we have no choice but to direct the district court to consider whether a stay is appropriate in this case under 21 U.S.C. Sec. 881(i).
 
 
 30
 Given the very serious interests of both parties in such situations, before granting a stay under 21 U.S.C. Sec. 881(i) a district court must make express findings of fact and conclusions of law concerning the existence of the statutory prerequisites for a stay. As we have noted, the district court entered only a one sentence order, and we must therefore direct it to issue fully articulated and explicit findings upon which it could base a stay. In so doing, the court is of course free to reconsider not only the propriety of a stay but also the appropriateness of any alternative limitations on the stay. Since the district court has not addressed the statute, we are reluctant to draw any conclusions concerning its application in this case without an evidentiary record and more extensive hearings. Some general observations concerning the statutory prerequisites, however, are in order.
 
 
 31
 * First, before a stay may be entered the forfeiture proceeding must be one "related to" an indictment alleging drug violations. "Related to" is neither a term of art nor statutorily defined, so whether a forfeiture proceeding is related to a criminal indictment demands a common-sense, fact-bound analysis. It is clear that civil and criminal cases need not be perfectly "parallel" in order to be related, i.e., they need not involve identical parties, transactions and issues. See United States v. Banco Cafetero Intern., 107 F.R.D. 361, 365 (S.D.N.Y.1985) (although cases cannot be related where "parties, issues, and relevant facts and transaction are different ...[,] identity of issues and parties between criminal and civil case may not be necessary"), aff'd, 797 F.2d 1154, 1163 (2d Cir.1986) (granting stay but noting that "we do not agree ... that, once an action is filed, delays of any length may be allowed to allow completion of related criminal proceedings"); United States v. Parcel of Property, 4808 S. Winchester, 1988 WL 107346, 1988 U.S. Dist. LEXIS (N.D.Ill.1988) (cases involving same issues and transactions but not entirely identical parties held "related").
 
 
 32
 Without commenting on the ultimate merits of whether the civil and criminal proceedings are related, with respect to the residences case (90-8152) we feel constrained to say that, on the record before us, we frankly do not see how the district court could have meaningfully considered whether the statute applies because the allegations of the complaint, the only basis for granting the stay, are so vague. At most, it avers that an alleged drug trafficker is the husband and father of the claimants, and the claimants purchased real property with cashier's checks. Perhaps supplemental affidavits or testimony could describe with greater particularity the relation between the civil action and the criminal case. We leave that to the district court on remand.
 
 
 33
 With respect to the shopping center case (90-8151), the basis upon which the district court granted the stay, although still inadequately identified, is somewhat stronger. The verified complaint at least alleges, as evidence of "relatedness" between the civil and criminal cases, that the funds for the purchase of the respondent property came directly from the alleged drug trafficker. Nevertheless, the district court granted the stay ex parte, allowing no opportunity for the claimants to rebut the alleged relationship between the cases with specific facts concerning the purchaser's identity or the source of the funds. Moreover, as we have noted, relation between the cases is only one of the two statutory prerequisites for granting a stay.
 
 B
 
 34
 With respect to the second requisite, the government must also demonstrate "good cause" in order to obtain a stay. Since any relationship between criminal and civil cases raises the prospect of civil discovery abuse that can prejudice the criminal case, good cause requires more than the mere possibility of prejudice. Banco Cafetero, 107 F.R.D. at 366 (allegations of prejudice to criminal case from civil discovery are "conclusory and insufficient to warrant a stay of the civil forfeiture actions"); United States v. One Parcel of Real Estate at 1303 Whitehead St., 729 F.Supp. 98, 99 (S.D.Fla.1990) (same); United States v. One Parcel of Real Estate Located at 12525 Palm Road, 731 F.Supp. 1057 (S.D.Fla.1990) (same). A determination of good cause, and the resulting grant of a stay, can deprive claimants of property without a hearing for a long time. This is an extremely harsh consequence, which has been analogized to the consequences of granting a preliminary injunction. U.S. v. One Parcel of Real Estate at 1303 Whitehead St., 729 F.Supp. 98, 100 (S.D.Fla.1990) (requires Government to show substantial likelihood it will prevail on the merits, substantial threat of irreparable injury if stay is denied, that threatened injury to government outweighs threatened injury to claimant from stay, and that granting stay will not disserve public interest); 12525 Palm Road, supra (same). The government should at least be required to make a specific showing of the harm it will suffer without a stay and why other methods of protecting its interests are insufficient. Any determination of "good cause" that warrants a stay simply must be accompanied by specific findings of fact and determinations that the government will suffer specific forms of prejudice.
 
 
 35
 The district court is not limited to a simple choice of either granting an all-inclusive stay or denying the government all relief. As in the grant of a preliminary injunction, there must be some weighing of the equities involved, and some consideration of alternative means besides seizure, such as bonds or a lis pendens, of protecting the government's interests. 12525 Palm Road (ordering in camera inspection of materials sought in discovery). A determination of "good cause" is thus a mixed question of law and equity, requiring consideration of any mitigating circumstances that affect the appropriateness of a stay. Certainly, when the consequence of a stay is to preclude persons displaced from their homes from attempting to regain access to their property, the district court must consider means of ameliorating the stay's severe effects.
 
 
 36
 If the effective weighing of equities is often difficult without a hearing, it is certainly impossible without permitting a response to the contentions of one party. As we have noted, the district court granted this stay ex parte. In our view, a district court best exercises its considerable discretion in such cases by not granting stays ex parte unless the particular factual circumstances present some emergency. Here, for example, had a hearing been held to determine whether the statutory prerequisites for a stay were satisfied, the parties would have had an opportunity to present alternative measures to the court, short of the all-inclusive stay that has generated these petitions for mandamus.
 
 IV
 
 37
 The petitioners also request that we set aside the district court's order confining discovery to the Western District of Texas. Control over the mechanics of discovery is left to the discretion of the trial court. Mayo v. Tri-Bell Indus., 787 F.2d 1007, 1012 (5th Cir.1986). Although meaningful review of this order is difficult because the district court made no findings concerning the need for this order, we cannot say it was an abuse of discretion.
 
 V
 
 38
 For the foregoing reasons, petitioners' motions for mandamus are granted in part.[11] The district court is directed to hold a hearing for the purpose of determining whether the statutory prerequisites for a stay have been satisfied, and to reconsider the propriety of a stay or other alternative measures in the light of this opinion.
 
 
 
 [1]
 21 U.S.C. Sec. 881(a)(6) provides:
 The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 
 [2]
 This declaration was necessary to "verify" the complaint
 
 
 [3]
 At oral argument before us, counsel for the claimants explained that he had then offered to post a bond, set after a court-approved appraisal, to avoid the property's being seized. The government conceded that it had refused this offer. The government later stated that it would consider entering some sort of occupancy agreement to permit continued use of the property by the claimants during the pendency of the forfeiture proceeding
 
 
 [4]
 Claimants' counsel indicated that the claimants now reside in Mexico
 
 
 [5]
 According to representations made at oral argument, claimants' counsel again attempted to work out an arrangement that would avoid seizure of the property during the forfeiture proceeding. He explained that he discharged the current property manager, who was alleged to have had some connection with Munoz Talavera, and hired a new and widely respected property manager. Counsel offered to create new accounts for all receipts earned by the property, and to apprise the government of all receipts and disbursements the center's owner would make. He did not, after having been once refused, offer to post a bond. The government rejected these offers and hired its own property manager
 In its haste to move decisively in this highly publicized case, the actions of the United States, including the expedited procuring of arrest warrants and seizure orders for personal residences, moving ex parte for a lengthy stay and refusing to negotiate alternative means of protecting its interests, can be described as misdirected zeal and the heavy-handed exercise of power.
 
 
 [6]
 The government's memorandum of law made no mention of the statutory authority upon which it now claims that the stay is based. Instead, it appears to have simply sought the stay as an exercise of the court's inherent discretion to control the course of litigation. It now argues that the stay is explicitly authorized by 21 U.S.C. Sec. 881(i)
 
 
 [7]
 The Supplemental Rules require more definite and specific averments in a complaint than the simple "notice pleading" of the Fed.R.Civ.P. Compare Rule 8, Fed.R.Civ.P. and Rule E(2)(a), Supplemental Rules. Rule E(2)(a) provides:
 (2) Complaint; Security.
 (a) Complaint. In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading.
 
 
 [8]
 This multidefendant conspiracy case, involving the largest single seizure of cocaine in U.S. history, is still in the pretrial stage
 
 
 [9]
 Since the order suspending depositions was entered the same day that the order granting the government a stay was entered, it presumably restricts further taking of depositions until the resolution of the criminal case
 
 
 [10]
 Indeed, it would appear that this court is the only one which has even heard argument on the matter
 
 
 [11]
 The following interim order was already entered in this matter, which we reaffirm here:
 In 90-8151, the district court is directed to:
 1) lift its stay of the proceedings, and
 2) lift its stay of discovery and permit discovery that will enable the petitioners to attempt to recover their property, subject only to limits that protect the government's legitimate interests in avoiding demonstrable prejudice to pending criminal cases or investigations.
 In 90-8152, the district court is directed to:
 1) lift its stay of the proceedings,
 2) rule on petitioners' motion to dismiss, and
 3) if it denies the motion to dismiss, lift its stay of discovery and permit discovery that will enable the petitioners to attempt to recover their property, subject only to limits that protect the government's legitimate interests in avoiding demonstrable prejudice to pending criminal cases or investigations.
 Petitioners' request that the order confining discovery to the Western District of Texas be set aside is denied.