### In re QUALITY MEDICAL CONSULTANTS, INC., Debtor.

**Bankruptcy No. 95–00315–6J1.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Nov. 28, 1995.

Amended Order Partially Sustaining Objection to Claim Nov. 29, 1995.

Laurie K. Weatherford, Orlando, Florida, for debtor.

Brian L. Schwalb, Trial Attorney, Tax Division, United States Department of Justice, Washington, DC.

## ORDER DENYING RENEWED MOTION FOR STAY OF CONTESTED MATTER

KAREN S. JENNEMANN, Bankruptcy Judge.

This case came on for consideration on the Renewed Motion for Stay of Contested Matter (the "Motion") (Doc. No. 298), filed by the United States of America (the "Service"). The Service is seeking an indefinite stay of all hearings and decisions relating to a contested matter concerning a claim filed by the Service in this Chapter 11 case. The Motion alleges that continued action in this contested matter will prejudice a pending criminal prosecution related to the Service's claim. After reviewing the pleadings and considering the issues presented and applicable law, the Motion is denied.

■ *Background.* On January 20, 1995, Quality Medical Consultants, Inc. ("Debtor")

filed its petition under Chapter 11 of the Bankruptcy Code (Doc. No. 1). On May 1, 1995, the Service filed an Amended Proof of Claim (the "Claim") (Claim No. 31) in the amount of $443,514.04, which includes, *inter alia,* penalties for Debtor's alleged intentional disregard in failing to timely and accurately file certain information returns. In response, on August 7, 1995, the Debtor filed an Amended Objection to Claim No. 31 (the "Objection") initiating this contested matter [1] (the "Claim Litigation").[2]

On October 25, 1995, the Service filed a Motion to Dismiss or, in the Alternative, for Stay of Final Evidentiary Hearing on Debtor's Objection (the "Prior Motion") (Doc. No. 290). The Prior Motion alleged the existence of a pending criminal investigation involving "many of the same facts, circumstances and individuals that are involved" in the Claim Litigation. On October 26, 1995, immediately prior to a hearing on the Objection, the Court conducted a hearing on the Prior Motion at which time the Prior Motion was denied (Doc. No. 303).

The Service has now filed the renewed Motion which indicates that on October 26, 1995, a criminal complaint (the "Complaint") was filed in the United States District Court for the Middle District of Florida (the "Criminal Proceeding") against Robert Caddick ("Caddick"), as chief financial officer of West Volusia Hospital Authority (the "Authority"). The Complaint alleges that Caddick made an improper investment of Authority funds by loaning money to Debtor and that he personally received illegal payments as consideration for the loan. The Motion alleges that continuation of the Claim Litigation may have "potential adverse collateral effects" on the Criminal Proceeding and requests that the Court revisit the denial of the Prior Motion in light of the Complaint filed against Caddick. No specific negative effects were identified.

---

1. The filing of an objection to a claim creates a contested matter under the Federal Rules of Bankruptcy Procedure. Fed.R.Bankr.P. 9014 (1983) advisory committee's note.

2. On October 18, 1995, the Service filed a Third Amended Proof of Claim (the "Third Claim") (Claim No. 51) which assesses additional penal-

ties for failure to withhold taxes. On October 31, 1995, Debtor filed its Objection to Claim No. 51 (the "Second Objection") (Doc. No. 296). The hearing on the Second Objection is scheduled for December 5, 1995, and constitutes a continuation of the hearing in the Claim Litigation.

■ *Stay of Civil Proceedings is Discretionary.* A decision to stay civil proceedings during the pendency of criminal proceedings is dependent upon the circumstances and competing interests involved. *Federal Sav. and Loan Ins. Corp. v. Molinaro,* 889 F.2d 899, 902 (9th Cir.1989), *citing, Securities and Exch. Comm'n. v. Dresser Indus., Inc.,* 628 F.2d 1368, 1375 (D.C.Cir.1980), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980). Factors which a court may consider in its decision include, but are not limited to:

(1) the interest of the [Debtor] in proceeding expeditiously ... and the potential prejudice to [Debtor] of a delay;

(2) the burden which any particular aspect of the proceedings may impose on [the Service];

(3) the convenience of the court in the management of its cases, and the efficient use of judicial resources;

(4) the interests of persons not parties to the civil litigation; and

(5) the interest of the public in the pending civil and criminal litigation.

*Id.,* at 902–03.[3] In order to obtain a stay of civil forfeiture proceedings, for instance, the Government must demonstrate "good cause" which "requires more than the mere possibility of prejudice" arising from potential discovery abuses. *United States v. 6600 North Mesa (In re Ramu Corp.)* 903 F.2d 312, 320 (5th Cir.1990). Ultimately, the decision of whether to stay the civil proceeding turns on a balancing of interests. *Campbell v. Eastland,* 307 F.2d 478, 490 (5th Cir.1962), *cert. denied,* 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502 (1963).

■ *Prejudice to Debtor.* The Debtor needs to complete its reorganization efforts as quickly as possible to preserve its ongoing business and to protect the interest of its many other creditors. Given the size of the Service's claims, a determination of the amount owed by the Debtor to the Service is integral to the Debtor's ability to formulate a plan of reorganization. Delaying the determination of the amount of the Claim delays any reorganization which, because of the ad-

ditional costs attendant to an uncertain delay, is extremely prejudicial to both Debtor and its many other creditors.

*Prejudice to the Service.* In this case, the Service alleges that the Claim Litigation may have "potentially adverse collateral effects" in the criminal proceeding against Mr. Caddick. The Claim Litigation concerns penalties for the Debtor's failure to file information returns and to pay withholding taxes. The Criminal Proceeding, on the other hand, concerns an officer of a public authority who allegedly abused his position. It is difficult to perceive how a determination of penalties assessable for a corporation's failure to file information returns and pay withholding taxes may impact a bribery case against a public official who is not otherwise related to Debtor. Certainly, the Service has failed to establish any direct connection which would justify the drastic relief sought in its Motion.

*Convenience to the Court.* The convenience of the court and efficient use of judicial resources do not weigh in favor of either party.

*Interests of Other Persons.* Each and every creditor of the Debtor is awaiting a decision of the Claim Litigation. The resolution of this issue is directly related to when and how the Debtor's reorganization process will conclude. The interests of these persons who are not direct parties to the Claim Litigation but who are directly interested in the prompt resolution of the Objection are favored by prompt resolution of the Claim Litigation.

*Interest of the Public.* In the absence of demonstrated prejudice in the Criminal Proceeding, the public interest is served by a prompt resolution of the Claim Litigation. If the Debtor's plan is successful, the public interest in rehabilitation of an existing business will be served; if not, the public interest will be served by prompt conversion to Chapter 7 and liquidation of Debtor's assets. The continued delay and uncertainty which would arise upon an indefinite stay of the Claim Litigation is contrary to public interest.

---

3. The Ninth Circuit Court of Appeals in *Molinaro* also considered the extent to which the defen-

dant's Fifth Amendment rights were implicated, a factor not relevant to the Service's Motion.

In summary, the Service has failed to show any significant prejudice. On the other hand, the interests of the bankruptcy estate, including both the Debtor and its creditors, are better served by a prompt resolution of the Claim Litigation. Accordingly, the Motion is denied.

DONE AND ORDERED at Orlando, Florida, this 28th day of November, 1995.

*AMENDED ORDER PARTIALLY SUS-*
 *TAINING OBJECTION TO CLAIM*
 *NO. 31 FILED BY INTERNAL REVE-*
 *NUE SERVICE*

This case came on for hearing on October 26 and 27, 1995, on the Amended Objection to Claim No. 31 (the "Objection") (Doc. No. 203) filed by Quality Medical Consultants, Inc. ("Debtor") and the Response to Objection to Claim (the "Response") (Doc. No. 245) filed by the United States of America (the "Service"). Debtor objects to the penalty of $245,314 assessed for the Debtor's failure to timely and completely file informational returns for tax years 1993 and 1994 as sought by the Service in Claim No. 31 (the "Claim") (Doc. No. 31). After reviewing the pleadings and considering the evidence presented, arguments of counsel and applicable law, the Objection is partially sustained.

*General Description of Debtor.* Debtor is engaged in the business of reviewing health and insurance claim reimbursements for hospitals and other health care providers. Independent contractors (the "Contractors"), who are both individuals and corporations, assist the Debtor in its business for an agreed fee. In addition, Debtor pays interest on loans which it has received from various individuals and corporations.

*1993 Tax Reporting.* For tax years 1991 and 1992, Debtor hired an independent accountant to prepare and file tax forms required under the Internal Revenue Code[1] (the "Code"). In September, 1993, Debtor hired Eldon Wade ("Wade") as a chief financial officer and instructed him to prepare and file all tax returns. Accordingly, in the first quarter of 1994, Wade instructed employees in the Debtor's accounting department to prepare and file the information returns

which are at issue in this contested matter—Forms 1096 and 1099.

Forms 1099, both 1099–INT and 1099–MISC, inform parties of the amount of compensation or interest income received during the previous tax year ("Forms 1099") and are due by January 31 of the year after the applicable tax year. Form 1096, the Annual Summary and Transmittal of U.S. Information Returns ("Forms 1096"), merely transmits and summarizes all of the Forms 1099 that a company issues for a particular tax year and are due by February 28 of the year following the applicable tax year. For simplicity, Forms 1096 and Forms 1099 are sometimes collectively referred to as the "Returns."

Although Wade and the employees in the accounting department generally were familiar with the purpose of the Returns, neither had previously prepared Returns or been employed by an entity which contracted with health care services providers. Linda Saldutti ("Saldutti"), an accounting employee, was given primary responsibility to prepare the 1993 Returns. In preparing the Returns, Ms. Saldutti reviewed the Service's 1993 Instructions for Forms 1099 (the "Instructions") (Debtor Exhibit 13).

On February 24, 1994, Debtor filed its 1993 Form 1096 and sent copies of Forms 1099–INT simultaneously to interest recipients (Service Exhibit 2). Subsequently, on March 1, 1994, Debtor filed a second 1993 Form 1096 and sent copies of Forms 1099–MISC ("Initial 1993 Filing") (Service Exhibit 1) simultaneously to certain Contractors who received compensation from Debtor during 1993. However, the Debtor sent Forms 1099–MISC only to *individuals.* The Debtor mistakenly did not provide Forms 1099 to *corporations.* As a general rule, only individuals receive Forms 1099; however, an exception exists which requires corporations who are "medical or health care service providers" to also receive Forms 1099. Apparently, Ms. Saldutti misinterpreted the Instructions which require that Forms 1099 be provided to *all* "medical or health care ser-

---

1. Title 26, United States Code.

vices providers" regardless of whether they are individuals or corporation.

Ms. Saldutti's testimony regarding her mistaken interpretation was very credible. She testified that in preparing the 1993 Returns she first read the Instructions and then prepared a vendor list (Debtor Exhibit 10) on which she marked recipients of Form 1099 by whether they were an individual or a corporation. She prepared the Initial 1993 Returns using this list. Ms. Saldutti was asked to prepare complicated Returns with no prior experience. She read, but innocently misinterpreted, the Instructions which are complicated and ambiguous at best.

*Bankruptcy and Related Distractions.* In December, 1994, a group of three of the Debtor's six shareholders engineered a scheme to gain management control of the Debtor (the "Unauthorized Management") (Doc. Nos. 48, 75 and 87). This group made immediate and radical changes in the Debtor's daily operations, and it is probable that they were not acting in the best interest of the Debtor or its creditors. Ultimately, on January 20, 1995, Debtor filed its petition (the "Petition") under Chapter 11 of the Bankruptcy Code.

Soon after the Chapter 11 case was filed, one of the ousted shareholders filed a Motion to Dismiss (Doc. No. 24) in the Chapter 11 case alleging that Unauthorized Management lacked corporate authority to file the bankruptcy case. The litigation involving this motion was intense and hurried resulting in multiple depositions, several days of evidentiary hearings, a lengthy mediation session and an overwhelming consumption of the Debtor's time. Finally, on March 9, 1995, less than two months after the Chapter 11 filing, but after the 1994 Returns were due, the motion was granted, and Unauthorized Management was removed from control.

At the same time as the chaos was occurring to determine who legally controlled the Debtor, the Debtor was experiencing the normal disruptions every company who files a Chapter 11 case experiences. Checks were bouncing; vendor and customer calls were incessant. Also, because the Debtor operates on a calendar year basis, year end financial reports, which were essential to deter-mine the company's financial condition, were due. On top of all of this, West Volusia Hospital (the "Hospital"), the Debtor's largest creditor, was seeking the appointment of a trustee in the Debtor's Chapter 11 case. All of these matters were occurring during January and February, 1995, at exactly the same time the 1994 Returns were due.

Finally, on March 9, 1995, the logjam broke. Unauthorized Management was removed. The Debtor's prior officers reassumed responsibility for the Debtor. The Hospital agreed to the appointment of a third party examiner in lieu of a trustee and, at last, the Debtor was free to resume a more normal type of daily operations.

*1994 Tax Reporting.* Without question, the Debtor did not timely file the 1994 Returns. Indeed, Unauthorized Management, who controlled the Debtor from December 8, 1994 through March 9, 1995, intentionally decided that given all of the company's other crises, the completion of the 1994 Returns had a lower priority and instructed employees in the Debtor's accounting department to complete projects other than the 1994 Returns.

Approximately two weeks after the Debtor's legal management was restored, the Service began an examination of Debtor, and on March 31, 1995, the Service notified Debtor that the 1994 Returns were late and that the 1993 Returns were incomplete because corporations which received compensation as Contractors in 1993 had not received appropriate Forms 1099. Eleven days later, on April 11, 1995, Debtor filed its 1994 Returns (Service Exhibits 3 and 4). Given all the competing demands for the Debtor's limited resources, the fact that restored management was able to file the 1994 Returns only eleven days after the Service's request is remarkable.

*Correcting Deficiencies in 1993 Returns.* With respect to deficiencies identified by the Service in the Initial 1993 Filing, in March, 1995, the Debtor hired a new chief financial officer, David Rosenfield, who determined that an independent accounting firm should prepare any additional Forms 1099 for 1993. Because the deficiencies had occurred long

ago, Mr. Rosenfield prudently decided that he needed expert assistance in preparing the Returns to avoid future problems. Accordingly, on July 12, 1995, Debtor filed its Application to obtain court approval to retain Chastang, Ferrell, Sims & Eiserman, P.A., as accountants (the "Accountants") to provide, *inter alia,* financial and accounting assistance (Doc. No. 177). On August 10, 1995, an order was entered approving the retention of Accountants by Debtor (Doc. No. 216).

On September 27, 1995, with the assistance of the Accountants, Debtor filed additional Returns for 1993 (the "Second 1993 Filing") to cure deficiencies identified by the Service (Service's Exhibits 8 and 9). The Accountants did not complete a full audit of the Debtor's records but, instead, reviewed the list prepared by the Service of possible additional recipients of Forms 1099 in 1993. It is interesting to note that the Accountants removed several entities from the list prepared by the Service because they did not need to receive Forms 1099. Further, the Service agent responsible for the Debtor's audit recognized that errors do occur in preparing Forms 1099 even when they are prepared with the assistance of the Service. As such, the short delay necessary to obtain the assistance of the Accountant was both prudent and necessary.

*Service's Proof of Claim.* On May 1, 1995, the Service filed its Claim in the amount of $443,514.04, seeking, *inter alia,* penalties totalling $245,314 (the "Penalties") representing penalties of $164,197 for 1993, and $81,-117 for 1994. The Service calculated the Penalties using the standard that the Debtor intentionally disregarded its responsibilities to timely and correctly file the Returns.

*Debtor's Objection.* On August 7, 1995, Debtor filed the Objection. The Debtor objects to the Penalties on the basis that the

late filing of the Returns was not attributable to intentional disregard. Debtor alleges that the Returns were filed as soon as practicable under the circumstances and that the Debtor should be assessed minimal penalties for its failure to timely file the Returns which would amount to $750 for 1993, and $600 for 1994, for a total of $1,350 (the "Allowable Amount").[2] In summary, the Debtor acknowledges that a penalty of $1,350 is appropriate for not timely filing the Returns but that a penalty of over $245,000 is excessive since the Debtor did not intentionally disregard its responsibilities.[3]

*Issue.* The only issue in this contested matter is whether the Debtor intentionally disregarded its duty to file its 1993 and 1994 Returns.

■ *Burden of Proof.* Once filed, a proof of claim is *prima facie* evidence of both the validity of the claim and the amount. Fed.R.Bankr.P. 3001(f) (1983); *St. Augustine Gun Works, Inc.,* 75 B.R. 495, 499 (Bankr. M.D.Fla.1987). Generally, the creditor bears the ultimate burden of proving the claim once the objecting party has overcome the *prima facie* presumption. *Pyramid Energy, Ltd. v. Heyl & Patterson, Inc. (In re Pyramid Energy, Ltd.)* 160 B.R. 586, 592 (Bankr. S.D.Ill.1993). However, the burden is on the taxpayer to show that it did not intentionally disregard the rules and regulations resulting in assessment of additional tax. *Marcello v. Commissioner,* 380 F.2d 499, 506 (5th Cir. 1967), *reh'g denied, cert. denied,* 389 U.S. 1044, 88 S.Ct. 787, 19 L.Ed.2d 835 (1968) *citing, Boynton v. Pedrick,* 228 F.2d 745 (2d Cir.1955), *cert. denied,* 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1465 (1956), *reh'g denied,* 351 U.S. 990, 76 S.Ct. 1046, 100 L.Ed. 1503 (1956). Therefore, the burden is on the Debtor to show lack of intentional disregard.

---

**2.** Debtor also argues that the Penalties should be equitably subordinated to all other unsecured claims. At the hearing, the Court deferred argument on the equitable subordination issue pending entry of an order on the amount of allowable penalties.

**3.** Although Debtor argued at the hearing that the failure to file the Returns was attributable to "reasonable cause," Debtor does not seek to

avoid the penalties in their entirety under the safe harbor rules of Section 6724 of the Code and Treasury Regulation § 301.6724–1. While Debtor has demonstrated the existence of some mitigating factors attendant to the failures to file, it could not bring itself within the rigid exceptions for acting in a responsible manner or exercising due diligence required under Section 6724 to support a showing of reasonable cause.

■ *Requirement to File Returns.* Section 6041(a) of the Code provides in relevant part:

(a) **Payments of $600 or more**—All persons engaged in a trade or business and making payment in the course of such trade or business to another person, of ... compensations ... or other ... income ... of $600 or more in any taxable year, ... shall render a true and accurate return to the [Service], under such regulations and in such form and manner and to such extent as may be prescribed by the [Service], setting forth the amount of such ... income, and the name and the address of the recipient of such payment.

· · · · ·

(d) **Statements to be furnished to persons with respect to whom information is required.**—Every person required to make a return under subsection (a) shall furnish to each person with respect to whom such return is required a written statement showing—

(1) the name and address of the person required to make such return, and

(2) the aggregate amount of payments to the person required to be shown on the return.

The written statement required under the preceding sentence shall be furnished to the person on or before January 31 of the year following the calendar year for which the return under subsection (a) was required to be made [4]. ...

26 U.S.C. § 6041 (1994). The regulations promulgated pursuant to Section 6041 provide a general rule that Returns are not required with respect to payments made to corporations. Treas.Reg. § 1.6041–3(c) (as amended in 1990). The regulations contain an exception, however, for payments "to a corporation engaged in providing medical and health care services or engaged in the billing and collecting of payments in respect to the providing of medical and health care services ..." *Id.*

*Penalties for Failure to File Returns.* Section 6721 of the Code provides penalties for a taxpayer's failure to file information Returns required under Section 6041:

**§ 6721. Failure to file correct information returns**

(a) **Imposition of penalty.**—

(1) **In general.**—In the case of a failure described in paragraph (2) by any person with respect to an information return, such person shall pay a penalty of $50 for each return with respect to which such a failure occurs, but the total amount imposed on such person for all such failures during a calendar year will not exceed $250,000.

(2) **Failure subject to penalty.**—For purposes of paragraph (1), the failures described in this paragraph are—

(A) any failure to file an information return with the [Service] on or before the required filing date, and

(B) any failure to include all of the information to be shown on the return or the inclusion of incorrect information ... [5]

(e) **Penalty in case of intentional disregard.**—If one or more failures described in subsection (a)(2) are due to intentional disregard of the filing requirement (or the correct information reporting requirement), then, with respect to each such failure—

· · · · ·

(2) The penalty imposed under subsection (a) shall be $100, or, if greater—

(A) ... 10 percent of the aggregate amount of the items to be reported correctly, ...

26 U.S.C. § 6721 (1994).

The regulations promulgated pursuant to Section 6721 define intentional disregard as:

---

4. Information Returns required under Section 6041(a) must be filed with the Service by February 28 of the year following the calendar year for which the information is reportable. Treas.Reg. § 1.6041–6 (as amended in 1973).

5. Although certain reductions in the calculation of penalties are available under subsections (b), (c), and (d) of Section 6721, there is no assertion that any of these subsections are applicable in this case.

**(2) Meaning of "intentional disregard."**—A failure is due to intentional disregard if it is a knowing or willful—

(i) failure to file timely, or

(ii) failure to include correct information.

Whether a person knowingly or willfully fails to file timely or fails to include correct information is determined on the basis of all the facts and circumstances in the particular case.

Treas.Reg. § 301.6721–1(f)(1) and (2) (1991). The regulations further list factors to consider in determining intentional disregard:

(i) Whether the failure to file timely or the failure to include correct information is part of a pattern of conduct by the person who filed the return of repeatedly failing to file timely or repeatedly failing to include correct information;

(ii) Whether correction was promptly made on discovery of the failure;

(iii) Whether the filer corrects a failure to file or a failure to include correct information within 30 days after the date of any written request from the Internal Revenue Service to file or to correct; and

(iv) Whether the amount of the information reporting penalties is less than the cost of complying with the requirement to file timely or to include correct information on an information return.

*Id.,* at subsection (3).

In addition, the regulations provide examples of taxpayer failures which constitute intentional disregard. Each of the examples indicate an obviously flagrant disregard by the taxpayer for its reporting responsibilities, such as using the name of a cartoon character as the payor or an agent's knowing non-disclosure of a significant payment to its principal.

Section 6722 of the Code sets forth similar penalties for a taxpayer's failure to provide correct Forms 1099 to income recipients.

**§ 6722. Failure to furnish correct payee statements**

**(a) General Rule.**—In the case of each failure described in subsection (b) by any person with respect to a payee statement, such person shall pay a penalty of $50 for each statement with respect to which failure occurs, but the total amount imposed on such person for all such failures during any calendar year shall not exceed $100,000.

**(b) Failures subject to penalty.**—For purposes of subsection (a), the failures described in this subsection are—

**(1)** any failure to furnish a payee statement on or before the date prescribed therefor to the person to whom such statement is required to be furnished, and

**(2)** any failure to include all of the information required to be shown on a payee statement or the inclusion of correct information.

**(c) Penalty in case of intentional disregard.**—If 1 or more failures to which subsection (a) applies are due to intentional disregard to furnish a payee statement (or the correct information reporting requirement), then, with respect to each failure—

**(1)** the penalty imposed under subsection (a) will be $100 or, if greater—

**(A)** ... 10 percent of the aggregate amount of the items required to be reported correctly, ...

26 U.S.C. § 6722 (1994).

The regulations promulgated under Section 6722 refer to the facts and circumstances described in Section 301.6721–1(f)(3) for determining intentional disregard for failure to timely file correct payee statements. Treas. Reg. § 301.6722–1(c) (1991). No separate examples of intentional disregard are included in the regulations for Section 6722.

*Legislative History.* Information return penalties under Section 6721 of the Code consist of a three-tier structure which is designed to provide an incentive to taxpayers to correct errors early. H.R.Rep. No. 247, 101st Cong. 1st Sess.1989. U.S.Code Cong. & Admin.News 1989 pp. 1906, 3018. The legislative history for amended Section 6721 indicates:

... If a person files a correct information return after the prescribed filing date but

on or before the date that is 30 days after the prescribed filing date, the amount of the penalty is $15 per return,.... If a person files a correct information return after the date that is after 30 days after the prescribed filing date but on or before August 1, the amount of the penalty is $30 per return.... If a correct information return is not filed on or before August 1 of any year, the amount of the penalty is $50 per return,....

... [T]he committee chose the August 1 date because this is approximately the date on which the IRS begins intensive processing and use of this data. Consequently, submission of the data after this date is effectively equivalent to not providing the data at all....

The bill maintains the present-law rules for failures that are due to intentional disregard of the filing requirement. Failure to correct information returns *within a reasonable time* after being requested to do so by the IRS could be considered to be intentional disregard.... (emphasis added)

*Id.*

 The legislative history clearly indicates that a penalty of $15–50 per return is intended to be the general penalty for untimely returns in the absence of special considerations which may increase the penalty upon a showing of intentional disregard. Thus, if a return is filed by August 1, the general penalty is a maximum of $50 per return. The implication from the legislative history is that a taxpayer must engage in flagrant and egregious conduct to be assessed an intentional disregard penalty. Certainly, failing to file a timely return is not enough to merit such a penalty absent the showing of other misconduct. Factors to consider include whether the (i) failure was due to a pattern of untimely or incomplete filing, (ii) taxpayer promptly corrected the error, and (iii) correction occurred within 30 days of a request by the Service.

 *Intentional Disregard.* Whether a taxpayer has intentionally disregarded a duty depends upon whether the conduct allegedly constituting intentional disregard was knowing and willful. Treas.Reg. § 301.6721–

1(f)(2), *supra.* In turn, a knowing and willful failure is determined from the facts and circumstances of each case. *Id.*

 Generally, intentional disregard of rules and regulations exists where the taxpayer knows or should know of its obligation and chooses to ignore such obligation. *Marcello, supra,* 380 F.2d at 506. At issue in *Marcello* was the Tax Court's determination that the taxpayer acted negligently (a second basis for assessment of fraud penalties in addition to intentional disregard under former Section 6653 of the Code) in failing to keep the books and records necessary to permit review of transactions which resulted in underpayment of income tax. In *Marcello,* the former Fifth Circuit Court of Appeals noted in a decision binding on this Court that, "[t]he penalty may be avoided by the taxpayer showing that he had no intent to disregard rules or regulations or by excusing his actions with an acceptable and justified reason...." *Id.,* at n. 20. The Fifth Circuit Court of Appeals in *Marcello* also held that the penalty may be avoided where the taxpayer failed to fulfill his obligations because of a mistake concerning his legal rights. *Id., citing, Bennett v. Commissioner,* 139 F.2d 961 (8th Cir.1944).

 Intentional disregard of tax statutes and regulations generally involve "flagrant abuses of the tax system." *Crowd Management Services, Inc. v. United States,* 889 F.Supp. 1313, 1317 (D.Or.1995). In addition, intentional disregard penalties are less likely to be upheld where the taxpayer has made a good faith effort to comply with tax regulations. *Id. See also, Erickson v. Commissioner,* 172 B.R. 900 (Bankr.D.Minn.1994) (properly assessed minimal penalties under Section 6721 for failure to file information returns). The Ninth Circuit Court of Appeals also has held that, "[i]f a taxpayer is 'misguided and unsophisticated in the realm of tax law,' and acts in good faith" excessive penalties should not be assessed. *Hansen v. Commissioner,* 820 F.2d 1464, 1469 (9th Cir. 1987), *quoting, Haman v. Commissioner,* 500 F.2d 401, 403 (9th Cir.1974).

*Application of Intentional Disregard Standard.* The Debtor in this case knew its

obligation to timely and completely file its 1993 and 1994 Returns. For reasons that differ between the two tax years, the Debtor did not fully meet its obligation.

■ A. *1993 Returns.* In early 1994, Debtor's employees attempted to properly prepare and file the 1993 Returns. Although Ms. Saldutti reviewed the Instructions, she had never prepared Forms 1099 before and did not understand that corporations engaged in medical and health care services were to receive Forms 1099. A mistaken belief as to what the law requires does not constitute intentional disregard. The Service argues that Ms. Saldutti had an obligation to review the correctly filed Returns for 1991 and 1992 because, if she had seen the prior year's returns, she would be able to complete the 1993 Returns more accurately. Certainly, Ms. Saldutti could have reviewed the 1991 and 1992 Returns. The prior year's returns would have been helpful. However, her failure to review the returns is not a basis for imposing intentional disregard penalties. Rather, her failure merely buttressed her testimony that she made a mistake based on inexperience. Therefore, Debtor's Initial 1993 Filing is not subject to intentional disregard penalties.

■ With respect to the Second 1993 Filing, Debtor made a cautious decision to have the Second 1993 Filing reviewed by the Accountants prior to filing on September 27, 1995. While the decision to obtain this expert assistance caused a slight delay, the Debtor did not intentionally disregard its duty. Indeed, the Debtor's actions, although slow and methodical, do not appear to be an attempt to evade their duty but, instead, to comply with the law. Accordingly, the Second 1993 Filing is not subject to intentional disregard penalties.

B. *1994 Returns.* In January, February and March, 1995, as discussed in more detail above, Debtor's employees were subjected to overwhelming distractions, including lawsuits, a bankruptcy filing and two upper-level management changes. These distractions prevented the Debtor from completing normal business activities, including the filing of the Returns. However, the 1994 Returns were filed by the Debtor within one month of the time legal management was restored and within ten days after being notified to file them by the Service.

■ As in the case with the 1993 Returns, Debtor never intended not to file the 1994 Returns. Indeed, Debtor promptly filed the 1994 Returns after the Service brought the failure to the Debtor's attention. Such actions do not indicate a flagrant violation by Debtor of its obligations [6], but are a reflection of the turmoil in which Debtor was embroiled in the first quarter of the year. This is not a case where Debtor's business was running smoothly and the filing requirements were merely ignored or treated frivolously. Debtor's actions, which in retrospect may seem irresponsible, must be viewed in the context in which they occurred. Given the multitude of demands facing Debtor, particularly in 1995, the Debtor, although late, did not intentionally disregard its duties. Accordingly, intentional disregard penalties are inappropriate under the circumstances.

The application of Section 6721(e) and 6722(c) suggested by the Service would allow the exception for higher penalties to consume the general penalty provisions of Sections 6721(a) and 6722(a). Any taxpayer who knew that he had reporting responsibility under Sections 6041 and failed to comply after more than 30 days [7] after the statutorily prescribed filing date would be subject to intentional disregard penalties. There would

---

**6.** The Service argues that the Debtor has a prior history of delinquent filings which constitute a pattern of conduct justifying the imposition of intentional disregard penalties. Specifically, Debtor often was late in paying employee withholding taxes and filing the related returns (Service Exhibit 8). Although the Debtor often would notify the Service in advance of anticipated deficiencies, the Service has had to utilize forced collection actions to require the Debtor to catch up on delinquent employee withholding

taxes. Undisputedly, the Debtor was always racing to pay these obligations timely. However, the Service has failed to establish any type of pattern that would indicate that the Debtor intentionally disregarded its obligations or had any prior instance of noncompliance in filing Forms 1099 or 1096. As such, the Service's argument on this point is not persuasive.

**7.** *See,* 26 U.S.C. Section 6721(b) (1994).

be no need for the standard penalty provisions contained in Sections 6721(a) and 6722(a).

In accordance with the foregoing, the Objection is partially sustained. The Claim will be reduced by the amount of $243,964.00, reflecting the amount of the penalties assessed under Section 6721(e) and 6722(c) of the Code ($245,314.00 less the penalties assessable under Section 6721(a) and 6722(a) of the Code). The amount of allowable penalties associated with the Debtor's failure to timely file the Returns is $1,350.

DONE AND ORDERED.