IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-20413
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

$9,041,598.68 (NINE MILLION FORTY ONE THOUSAND FIVE HUNDRED
NINETY EIGHT DOLLARS AND SIXTY EIGHT CENTS),

Defendant,

MARIO RUIZ MASSIEU,

Claimant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Texas
_____
December 15, 1998

Before JOLLY, BARKSDALE, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This is an appeal from a judgment of forfeiture, pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981, of $9,041,598.68 in United States currency.  Appellant, Mario Ruiz Massieu ("Massieu"), contends that he is the owner of the forfeited funds and that the district court erred in (1) entering judgment in favor of the Government as to the entire amount of the defendant currency, (2) finding post-verdict that he had no standing to contest the forfeiture, and (3) determining that the Government established probable cause for the forfeiture.  Additionally, he argues that the cumulative effect of the district court's

discovery and procedural rulings--e.g., denial of Massieu's request for an unredacted copy of the seizure affidavit (in order to seek suppression), ex parte examination of materials presented in support of Government's application for stay, failure to exclude testimony of last-minute Government witnesses, and failure to bifurcate the trial--deprived him of due process. For the reasons set forth below, we AFFIRM the district court's April 25, 1997 order for forfeiture.

## I.  PROCEDURAL BACKGROUND

On March 13, 1995, United States Magistrate Judge Frances Stacy, acting pursuant to a sealed affidavit, issued a warrant for the seizure of $9,041,598.68 in U.S. currency from an account at Texas Commerce Bank (TCB).  Approximately three months later, on June 15, 1995, the United States filed a complaint for forfeiture *in rem* against the seized currency.  The complaint alleged that the money constituted narcotics trafficking proceeds given to facilitate the movement of drugs into the United States. At the time the complaint was filed, Massieu, a former Deputy Attorney General for the Republic of Mexico, was in federal custody in New Jersey.[1]

On June 26, 1995, Massieu filed a Notice of Claim.  He served the United States with 18 multi-part interrogatories and a

---

[1]Massieu had been arrested in Newark on March 3, 1995, for violating 31 U.S.C. § 5316 by failing to declare that he was carrying currency in excess of $10,000.

request to produce 52 categories of documents.[2]  He followed this on July 6, 1995 with his answer denying the factual recitations in the United States' complaint and a motion to dismiss for failure to state a claim.  He also moved for a protective order to relieve him of the duty to respond to the United States' interrogatories, which was denied on July 28, 1995.  Massieu alleged ownership of the seized currency, claiming that he had received the money from his brother.

On July 28, 1995, the United States moved for a protective order and to quash the interrogatories served by Massieu.  United States District Judge Nancy Atlas granted both motions on November 6, 1995.  On the same day, the Government requested that it be permitted to take Massieu's deposition to determine his claim of ownership.  Judge Atlas ordered the deposition to occur forthwith.

On March 31, 1996, the district court found that Massieu had standing and granted his February 20, 1996, motion to expedite. The court further addressed his motion to reconsider a January 11, 1996, order that sealed a United States' affidavit which had acquainted the court with informant information.  The court found that the interests of the United States in ongoing criminal investigations continued to justify the *ex parte* filing of the sealed affidavit.

---

[2]The Government, in comparison, served Massieu with nine interrogatories with the complaint.

On April 12, 1996, the Government moved the district court pursuant to 21 U.S.C. § 881(i) to stay civil discovery pending the criminal trial of narcotics trafficker Juan Garcia Abrego in United States v. Abrego.  At the May 31, hearing on the stay, Massieu's counsel requested copies of the sealed affidavits that had formed the basis for the stay.  Judge Atlas denied the request and granted the United States' motion to stay.

The Abrego prosecution was completed in October 1996. Massieu moved on November 18, 1996, to vacate the stay, to unseal documents, for an expedited pretrial conference, and for a speedy trial.  The court vacated its stay on December 11, 1996, granted the request for a speedy trial, and set the case for trial on March 10, 1997.  The court further advised the parties that discovery disputes would be resolved promptly.

The Government filed its amended complaint on December 16, 1996, and one week later apprised the district court that it had answered Massieu's interrogatories and produced over 350 documents.  The Government also supplemented its production with additional documents in January 1997.

In a hearing on January 31, 1997, Judge Atlas ordered the Government to list its witnesses and to provide detailed witness information to Massieu.  The Government provided Massieu with a witness list on February 9, 1997.  The next day, on February 10, 1997, the district court ordered that depositions of the Government's witnesses begin on February 11, 1997, with the

4

Government making a rolling production of documents. At the February 10 hearing, the parties agreed that discovery would not be disclosed outside their respective staffs.

On February 18, 1997, the court held a hearing on the Government's motion for sanctions based on the dissemination of the Government's discovery, including the identity of its informants and agency reports, which were the cover story of "Processo," a weekly Mexican magazine.[3] Both parties asserted prejudice from the leak and attributed responsibility for the leak to the other party. Judge Atlas stated that she could not make a decision as to the source of leaks based on the current record and that as far as she was concerned the leak was of unknown origin. As a security precaution, the court ordered that the Government witnesses' depositions be taken and filed under seal, without copy to either party. The court, however, did authorize both parties to review the sealed transcript in the courthouse. Although such a limitation was no hardship for the Government, which had offices in the courthouse, Massieu charged that the court-imposed limitation was an enormous burden on his out-of-town counsel. Consequently, on February 26, 1997, he moved to obtain copies of the sealed witness depositions. The court approved release of only those portions of informant

---

[3]The article featured an interview with Juan Collado, Massieu's lawyer in Mexico, who received the Government's discovery from Mr. Canales, Massieu's trial attorney.

depositions that the Government designated as no longer necessary to keep under seal.

The following day, February 27, 1997, Massieu moved to exclude evidence obtained after June 15, 1995 (the date the forfeiture complaint was filed).  On March 3, 1997, he moved to bifurcate the proceeding into a bench trial to determine probable cause and a subsequent jury trial on defenses to the forfeiture. The court denied the motion but did require that the Government present its hearsay evidence, admissible only for the purposes of probable cause, outside the presence of the jury.

At 5:00 p.m. on March 5, 1997, two business days and less than five full days before trial, the United States disclosed the names of four additional informant witnesses, two of whom would testify at trial.  On March 7, Massieu moved to exclude the witnesses.  The court denied the motion and limited the depositions of the new witnesses to four hours if in Spanish or three hours if in English.

The jury trial proceeded on March 10, 1997.  The morning of trial, the district judge denied Massieu's motion to limit the Government's proof to June 15, 1995, yet informed the parties that she would make two probable cause rulings, one based on the Government's pre-complaint evidence and the other based on the evidence in its entirety.

During trial, the court found that probable cause to forfeit the currency existed both as of June 15, 1995, and as of the

forfeiture hearing.  The jury returned what appeared to be a mixed verdict, awarding Massieu $1,100,000 despite having resolved most issues in favor of the Government.  On April 25, 1997, the district court granted the Government's motion for judgment as a matter of law and set aside the $1,100,000 jury award.  Massieu appeals from that judgment.

## II.  FACTUAL BACKGROUND

Massieu was Deputy Attorney General of Mexico from June 1993 to January 1994 and then from July 1994 through November 1994. Initially, he was in charge of "delegations," the delegates to the 31 United Mexican States (the equivalent of United States Attorneys).[4]  Massieu's duties, however, expanded in August 1993 when the Director of the Mexican Federal Judicial Police (MFJP) began reporting to him.[5]

Sometime after his return to the Attorney General's Office in July 1994, Claimant instructed his associate, Jorge Stergios, to begin special investigations of drug cartel leaders.  Stergios sought out Agent Stanley Pimentel of the Federal Bureau of Investigation (FBI), who at that time was assigned as the legal attache to the United States embassy in Mexico City, and requested FBI agency intelligence on drug cartels.  Stergios' request was unusual given that the Drug Enforcement

---

[4]Jorge Stergios, Massieu's trusted associate, served as a coordinator between Massieu and the delegates.

[5]On August 25, 1993, Adrian Carrera Fuentes was appointed Director of the MFJP.

Administration, not the FBI, was in charge of drug matters in coordination with the Mexican National Institute to Combat Drugs.

More than unusual, Stergios' request, in hindsight, was suspect. Earlier in December 1993, Stergios had accompanied Massieu to Houston, where Massieu opened an account at Texas Commerce Bank. Between March 2, 1994, and February 14, 1995, Stergios made 25 cash deposits to Massieu's account, depositing more than $9 million. The currency bundles that Stergios deposited at TCB were secured by paper wrapper, rubber bands, or cellophane. Of the 25 deposits, 18 deposits did not contain any $100 bills; the majority of the currency was in $20 dollar bills.

On March 2, 1995, Massieu was questioned by Mexican authorities. After the interview, he, his wife, and his daughter flew from Mexico to Houston. Their baggage declaration stated that they would be at a Holiday Inn in Houston for three weeks for pleasure. However, the Massieus checked into the Holiday Inn and left the next day.

On March 3, 1995, U.S. Customs Agent Marcy Foreman was contacted by FBI Agent George Smith and asked to maintain a look-out for Massieu. According to Foreman, the request for assistance in locating Massieu originated from the FBI office in Mexico City. In checking flight manifests, Customs determined that Massieu was traveling to Spain via Newark, New Jersey. He was arrested in Newark after he failed to declare the amount of

currency he was carrying in excess of $10,000. The charges were later dismissed.

### III. DISCUSSION

### A. Standing

As a predicate to any action before a federal court, parties must establish that they have proper standing to raise a claim. See United States v. $321,470 in U.S. Currency, 874 F.2d 298, 302 (5th Cir. 1989). The issue of standing is one of law, and review is plenary. See United States v. $38,570 in U.S. Currency, 950 F.2d 1108, 1111 (5th Cir. 1992). "This Circuit has held that the burden of establishing standing to contest forfeiture is on the claimant seeking to come before the court." United States v. One 18th Century Colombian Monstrance, 797 F.2d 1370, 1374-75 (5th Cir. 1986). A claimant need not prove the merit of his underlying claim. See id. He must, however, be able to show at least a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and the "prudential considerations defining and limiting the role of the court." Id. This principle applies to all forfeitures.

The present appeal is complicated by the district court's post-verdict determination that Claimant lacked standing. Prior to trial, Judge Atlas had twice found that Massieu had standing to contest the forfeiture of the $9,041,598.68. It was only after the court submitted the case to the jury, reconciled the jury's facially inconsistent verdict, and granted judgment in

9

favor of the Government as to the entire amount of the defendant currency that the district court inexplicably revisited the issue of Article III standing.

Although we recognize that standing is "an indispensable part of the plaintiff's case" and as such, the plaintiff must demonstrate standing in "the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation," Meadowbriar Home For Children Inc. v. G.B. Gunn, 81 F.3d 521, 529 (5th Cir. 1996) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992)), we note that a tension exists between a district court's post-verdict, merits-based determination of standing and the requirement that an appellate court review standing as a threshold matter. In finding that Massieu lacked standing, the district court reasoned that the jury's responses to Special Interrogatories 1, 2, and 4--its finding that the $9,041,598.68 in its entirety constituted illegally acquired funds--necessarily negated any theory of ownership which Massieu might have offered. In other words, because the jury believed that all the money was in some way tied to the facilitation of narcotics trafficking, the court reasoned that the jury could not have, at the same time, believed that Massieu had acquired the funds from his family members apart from any illegal conduct.

Because the district court's determination that Massieu did not have standing to contest the forfeiture was based entirely on the jury's verdict, that finding can only be upheld if this Court were to determine: (1) that the district court properly interpreted the jury's responses to the Special Interrogatories as supporting a finding that the total sum of $9 million U.S. currency was tied to illegal narcotics activity, and (2) that none of Massieu's claims on appeal require reversing or invalidating the jury verdict. And so, in the present case, a threshold review of the issue of standing without a consideration of the merits becomes an impossibility. Allowing a district court to revisit the question of standing post-verdict necessarily invites this Court to chase its tail--we ought review standing as a threshold matter yet in order to do so we must review the merits. For this reason, we consider Judge Atlas' post-verdict discussion of standing as no more than a recognition of the fact that the jury verdict defeated all possible claims of Massieu on the merits, and we find the trial court's earlier determinations that Massieu had standing to be dispositive of that issue.[6]

## B. Probable Cause

---

[6]As such, it is unnecessary for this Court to address Massieu's claim on appeal that the district court erroneously granted the Government's Motion for Summary Judgement on the issue of gift.

11

In a forfeiture action, the Government bears the initial burden of demonstrating probable cause for belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute. See United States v. One 1986 Nissan Maxima GL, 895 F.2d 1063, 1064 (5th Cir. 1990). The probable cause threshold in this context is the same as that which applies elsewhere: "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." United States v. $364,960 in United States Currency, 661 F.2d 319, 323 (5th Cir. 1981). The government may prove the requisite probable cause by both circumstantial and hearsay evidence. See One 1986 Nissan, 895 F.2d at 1065. Although this Court reviews the district court's findings of fact for clear error, "[whether] the facts [are] sufficient to constitute probable cause is a question of law," which we review de novo. United States v. 1988 Oldsmobile Supreme, 983 F.2d 670, 674 (5th Cir. 1993).

Here, the Government proceeded to trial on four separate theories of forfeiture. First, the Government argued that the currency represented proceeds of drug trafficking activities in the United States and was thus forfeitable under § 881(a)(6). Second and third, the Government argued that the proceeds were involved in financial transactions in violation of § 1956(a) that occurred in the United States in furtherance of an overarching conspiracy and were thus forfeitable pursuant to § 981. The

12

fourth theory was based on Stergios' transportation of the drug proceeds from Mexico City for deposit to the TCB account, which would again make the money forfeitable under § 981 as involved in an § 1957(a) offense.

Massieu argues first that the Government should have been required to establish probable cause utilizing only that evidence which the Government had obtained prior to June 15, 1995, the date the complaint was filed, and second that the evidence at trial was insufficient to support the district court's findings of probable cause. In denying Massieu's motion to limit the Government's proof to pre-complaint evidence, the district court relied upon United States v. Monkey, 725 F.2d 1007 (5th Cir. 1984). The district court's reliance, however, is misplaced. This Court in United States v. Monkey did not have before it the issue with which we are presently confronted--whether post-complaint evidence is admissible to establish probable cause for forfeiture.

In United States v. Monkey, the Government sought forfeiture of a vessel on the grounds that it was used for importing controlled substances. See id. The issue before the court in that case was whether probable cause existed for the warrantless seizure and what effect, if any, an unlawful seizure would have on the forfeiture proceeding. See id. at 1011-12. We held that improper seizure does not jeopardize the Government's right to secure forfeiture if probable cause to forfeit the vessel can be

13

supported with untainted evidence.  See id. at 1012.  The unlawful seizure would only result in the inadmissibility of evidence obtained through the seizure.  See id.

The confusion over the precedential effect of the Monkey decision results from the fact that, in finding probable cause for the forfeiture, we explicitly relied on evidence obtained by the Government after the forfeiture complaint was filed.  This Court's past reliance on post-complaint evidence, although instructive, is not binding.  The issue of the admissibility of post-complaint evidence was not subjected to scrutiny in Monkey.  We also note that here, unlike in Monkey, the defendant currency was seized pursuant to a valid warrant, and the Government at no time sought to introduce evidence obtained from the seizure, namely the $9 million U.S. currency.

In the thirteen years since Monkey, we have not addressed the precise issue of whether the Government may rely upon evidence acquired after institution of forfeiture proceedings in showing probable cause.  Because this is a matter of first impression in this Circuit, we look to our sister circuits for guidance.  At present, there is a split on the issue of the admissibility of post-complaint evidence with respect to the probable cause showing.  The Ninth, First, and Eighth Circuits have held that the Government is restricted to evidence acquired

14

at the time of the complaint, while the Second and Sixth Circuits have reached the opposite conclusion.[7]

In the instant case, however, we do not reach the issue of whether post-complaint evidence is admissible to establish probable cause for forfeiture and, therefore, do not take sides in this circuit conflict. Because the district court separately considered whether probable cause existed as of June 15 and because we agree with its conclusion that probable cause existed as of that date, we address only the district court's finding of probable cause as of June 15, 1995.

The district court based its probable cause determination on the following factual findings:

> First of all, the circumstances of the $9 million . . . . I rely on Jose Nieto's testimony with respect to the manner in which the money was delivered to the bank, the way it was bundled . . . and at least on one or more occasions wrapped in cellophane . . . and that the cash deposits did not contain any 100-dollar bills, in Nieto's experience, was unusual. The cash deposits he said of more than $100,000 were extremely unusual and the number of 20s he found unusual in commercial matters . . . .

---

[7]For the propostion that post-complaint evidence is not admissible, see e.g., United States v. $191,910.00 in United States Currency, 16 F.3d 1051, 1066-67 (9th Cir. 1994); United States v. One Lot of U.S. Currency ($36,634), 103 F.3d 1048, 1053-54 (1st Cir. 1997); United States v. Parcels of Property, 9 F.3d 1000, 1003 (1st Cir. 1993); United States v. $91,960.00, 897 F.2d 1457, 1462 (8th Cir. 1990).

For the proposition that evidence acquired up to trial could be used to show probable cause, see, e.g., United States v. $67,220.00 in United States Currency, 957 F.2d 280, 284 (6th Cir. 1992); United States v. Premises and Real Property at 4492 S. Livonia Rd., 889 F.2d 1258, 1268 (2d Cir. 1989).

15

Robert Rutt testified that . . . there were different stories given by Stergios and absolutely no documentation for his explanations . . . .

With respect to the TCB deposits . . . within one week . . . three deposits of almost $1 million were made . . . Mr. Massieu was Deputy Attorney General of PGR delegates . . . from June 1993, to January, 1994, and, in March the substantial deposits began . . . The fact that the money was not immediately deposited is not material for the purposes of probable cause . . . .

With respect, though, to the timing of the money, in March, 1994, 1.5 million was deposited; in April, 1,650,000; in May, 650,000; in June, 500,000; in August, 300,000 [listing several more deposits]. . .

There is no meaningful explanation to the bankers or the Customs Service for the vast sums of money deposited . . . . And, so, the size of the deposits in such a short period of time in the condition it existed would be one factor to consider on probable cause to believe the money was drug proceeds . . . .

Mr. Menger testified that he was in the Customs Service and . . . that it was very rare for people to carry over $100,000 and the only people doing so were money exchangers . . . .

As to Massieu's taking of payments, the payments—the testimony of Robert Rutt and the matters in which he relied are of great significance. The Court does rely on Agent Munks' work prior to June 15 . . . who met with informants [like] Juan Antonio Ortiz . . . . Munks met with informants and learned that Carrera Fuentes . . . had delivered bribe money from drug traffickers . . . to Massieu . . . . Munks told Rutt that those informants were reliable. Rutt also said that he had information from an informant in touch with Agent Hanna that drug trafficking organizations in Mexico were paying bribes to Mexican law enforcement, although Mr. Massieu was not specifically mentioned . . . .

The other evidence is Adrian Carrera Funetes' statement . . . [that] implicates

16

> Massieu and Stergios having information from traffickers or others with knowledge of the [cocaine] shipment . . . .
>
> Stergios' odd request for assistance and information on the cartels to Pimentel, the FBI Agent . . . was known to the Government prior to June, 1995 . . . .
>
> In sum, while this evidence clearly would be insufficient for any finding other than probable cause . . . it just barely gets over the line as to this defendant currency, but I find that it is sufficient as of June 15, 1995.

Record Excerpts, Tab 9, at 1525-1532.

We agree with the district court's conclusion. Our review of the record leaves us with no doubt that the testimony of TCB bank representative Nieto with respect to the manner in which the money was bundled, the testimony of informant Tony Ortiz regarding his first-hand knowledge of the Abrego drug organization's practice of paying bribes to Mexican law enforcement, the hearsay testimony of Agent Rutt that bribe money had been paid from drug traffickers to Massieu, the statement of Adrian Carrera Fuentes implicating Massieu with knowledge of a cocaine shipment, and the records of Massieu's bank deposits revealing substantial cash deposits of largely twenty dollar bills could reasonably support a belief that the seized currency was derived from illicit drug transactions. This Court has found probable cause under less implicating circumstances. See, e.g., United States v. $400,000.00 in United States Currency, 831 F.2d 84 (5th Cir. 1987) (affirming the district court's determination of probable cause on the basis of the defendant's failure to

17

report currency transported into the United States, a lack of evidence of any completed report, and nervousness while currency was being counted). Accordingly, we hold that the district court did not err in finding that the Government's evidence as of June 15 satisfied the requirement of probable cause.

C.  Judgment as to Entire Amount of Defendant Currency

Post-verdict judgments as a matter of law are examined de novo. See Fed.R.Civ.P. 50. In reviewing the district court's decision to grant a judgment as a matter of law, this Court employs the same standard that guided the district court:

> We consider all the evidence with all reasonable inferences in the light most favorable to the party opposed to the motion. If the facts and the inferences point so strongly and overwhelmingly in favor of [the movant] that reasonable jurors could not arrive at a contrary verdict, then the motion was properly granted. If there is substantial evidence--that is, evidence of such quality and weight that reasonable and fair-minded jurors might reach a different conclusion--then the motion should have been denied.

Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948 (5th Cir.1994) (citations omitted).

Massieu asserts that the district court erred in denying his Motion For Judgment on Jury Question 5 and in entering judgment in favor of the Government as to the entire amount of the defendant currency. He claims that Judge Atlas disregarded the jury's finding in response to Special Interrogatory Number 5. The Government, in response, argues that the district court did

18

not disregard the jury's response to Special Interrogatory Number 5. Instead, it argues the court attempted to reconcile the apparently inconsistent answers provided by the jury to the five submitted special interrogatories.[8]

_____

[8]<u>Question No. 1</u>
Do you find from a preponderance of the evidence that the Defendant $9,041,598.68, in whole or in part, was *not* the proceeds of and was not used to facilitate drug trafficking activity?
Answer "yes" or "no": _____

Proceed to Question No. 2.

<u>Question No. 2</u>
Do you find from a preponderance of the evidence that the Defendant $9,041,598.68, in whole or in part, was *not* involved in a financial transaction that was conducted or attempted to be conducted with the intent to promote the carrying on of drug trafficking activity?
Answer "yes" or "no": _____

Proceed to Question No. 3.

<u>Question No. 3</u>
Do you find by a preponderance of the evidence that the Defendant $9,041,598.68, in whole or in part, was *not* transported or transferred from a place inside the United States to or through a place outside the United States with the intent to promote drug trafficking activity?
Answer "yes" or "no": _____

Proceed to Question No. 4.

<u>Question No. 4</u>
Do you find by a preponderance of the evidence that any one or more of the deposits to the account at Texas Commerce Bank is/are *not* a monetary transaction in criminally derived property of a value greater than $10,000.00 in United States currency derived from drug trafficking activity?
Answer "yes" or "no": _____

Proceed to Question No. 5.

<u>Question No. 5</u>
If you have answered "yes" to any of the above questions, then answer Question No. 5. If you have answered "no" to all of the above questions, then do not answer Question No. 5.

<u>Question No. 5</u>
To the extent, and only to the extent, you have found in answer to the foregoing questions

19

This Circuit has long held that a district court judge has a duty to attempt to reconcile a jury's apparently inconsistent responses to special interrogatories.  See Davis v. West Community Hosp., 755 F.2d 455, 465 (5th Cir. 1985).  Federal district courts are granted considerable latitude in interpreting special interrogatories because a judge is in the best position "to analyze the jury's intention and thus is charged, in the first instance, with the obligation of giving effect to those intentions in light of the surrounding circumstances."  P & L Contractors, Inc. v. American Norit Co., Inc., 5 F.3d 133, 138 (5th Cir. 1993) (citing McVey v. Phillips Petroleum Co., 288 F.2d 53, 59 (5th Cir. 1961)).

In the present case, the district court properly exercised its discretion by adopting a view of the case which made the jury's answers consistent.  See, e.g., Mercer v. Long MFG. N.C.,

---

that all or part of the defendant $9,041,598.68, if any, was:
- money used to facilitate drug trafficking activities or the proceeds of drug trafficking activities;

- a financial transaction that was conducted or attempted to be conducted with the intent to promote the carrying on of drug trafficking activity;

- money transported or transferred from a place inside the United States to or through a place outside the United States with the intent to promote drug trafficking activity; and/or,

- monetary transaction(s) in criminally derived property of a value greater than $10,000.00 in United States currency derived from drug trafficking activity,

what amount of the Defendant $9,041,598.68, if any, do you find from a preponderance of the
evidence was from a source *other than* the above sources?
    Answer in dollars and cents:     _____

Inc., 671 F.2d 946, 948 n.1 (5th Cir. 1982) (explaining that "[i]f there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly").  In order to give proper effect to all of the jury's responses, the court had to reconcile the jury's negative responses to Questions No. 1, 2, and 4, indicating that all of the defendant currency came from drug-related sources, with the jury's answer to Special Interrogatory Number 5 which could be construed as awarding Claimant $1,100,000.  Because the jury was not to answer Question No. 5 unless it had answered "yes" to any of the previous interrogatories, the court properly reasoned that the jury's answer to Question No. 5 served as an explanation of its answer to Question No. 3, the only interrogatory to which the jury had answered "yes."  According to the court, the response to Special Interrogatory Number 5 therefore only indicated that Massieu proved to the jury's satisfaction that $1,100,000 was not money "transported or transferred from a place inside the United States to or through a place outside the United States with the intent to promote drug trafficking activity," as referenced in Question No. 3.  Thus, the court reasoned that because the answer of $1,100,000 to Question No. 5 applied to only one of the government's four theories of forfeiture, it was academic and Massieu was not entitled to the $1,100,000.

Furthermore, Judge Atlas properly reconciled the jury's responses "in light of the surrounding circumstances, including

21

the instructions of the court." Davis v. West Community Hosp., 755 F.2d 455, 465 (5th Cir. 1985). Here, the court supplied the parties with a copy of the "Court's Instructions to the Jury" and the Verdict Form prior to closing arguments. The Government and Massieu both argued directly from the Verdict Form during their closing arguments, going so far as to indicate to the jury whether they desired a "yes" or "no" response to each question. For these reasons, Judge Atlas upheld the jury verdict and entered judgment in favor of the Government as to the entire $9,041,598.68.

Because we find the district court's reconciliation persuasive, we hold that the district court properly denied Massieu's Motion For Judgment on Jury Question 5 and properly entered judgment in favor of the Government as to the entire amount of the defendant currency.

### D. Due Process

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. The established rule is that claimants whose property is subject to forfeiture are entitled to due process including the right to reasonable notice of the basis on which forfeiture is sought and a reasonable opportunity to defend. See United States v. James Daniel Good Real Property, 510 U.S. 43, 48-63, 114 S.Ct. 492, 498-506 (1993); United States v. Marsh, 105 F.3d 927, 930-31 (5th

22

Cir. 1997).  This Court has held, "[w]here the Government seeks the traditionally disfavored remedy of forfeiture, due process protections ought to be diligently enforced, and by no means relaxed . . . ."  Armandariz-Mata v. U.S. Dept. of Justice, 82 F.3d 679, 683 (5th Cir.) cert denied, 117 S.Ct. 317 (1996).

Massieu submits that the district court's discovery and procedural rulings, either individually or cumulatively, deprived him of due process and asks this Court to review those rulings de novo.  Massieu, however, provides no authority for altering the usual abuse of discretion standard.  We note that a ruling which does not rise to the level of an abuse of discretion cannot alone constitute a due process deprivation.  Therefore, the appropriate standard of review for the individual discovery and procedural rulings remains an abuse of discretion.  See Mills v. Beech Aircraft Corp., 886 F.2d 758, 761 (5th Cir. 1989).

Moreover, Massieu requests that this Court utilize a cumulative error analysis.  Such an approach, however, is employed only in those cases where individual rulings are erroneous--where the appellant has " . . . [some]thing to cumulate."  Derden v. McNeel, 938 F.2d 605, 609 (5th Cir. 1991) (applying cumulative error analysis in the context of a habeas proceeding).  In Massieu's view, the district court committed reversible error in denying his request for an unredacted copy of the seizure affidavit (in order to seek suppression), conducting *ex parte* examination of Government exhibits presented in support

of its application for stay, failing to exclude testimony of last-minute Government witnesses, and failing to bifurcate the trial. We shall examine each of these claims of error in turn.

### 1. Denial of request for unredacted copy of the seizure affidavit.

Massieu argues that the district court erred in denying his request for an unredacted copy of the court-sealed seizure affidavit. He claims that without access to the affidavit he was unable to ascertain the basis for the seizure in order to contest its legality. Massieu's claim lacks merit. First, Federal Rule of Civil Procedure 26(c) provides for the sealing of records upon a showing of "good cause" by the moving party. Fed.R.Civ.P. Rule 26(c). A corollary to Rule 26(c) is that, once a district court has sealed a document, it is well within its discretion to deny a party's request for an unredacted copy of that same document. Second, even assuming *arguendo* an "illegal" seizure of the defendant currency, because the Government did not seek to introduce the actual currency at trial, there was no evidence in the present case that Massieu could have sought to suppress. <u>See</u> <u>United States v. Monkey</u>, 725 F.2d 1007, 1011-12 (5th Cir. 1984) (explaining that a lack of probable cause for the seizure would "only result in the suppression of evidence obtained by the wrongful seizure and would have no further bearing on the forfeitability of the property."). Accordingly, Massieu cannot

24

show any prejudice to his "substantial rights" that would justify reversal.  See Fed.R. Civ.P Rule 61.

## 2.  *Ex parte* examination of materials in support of application for stay.

Generally, the power to stay a pending matter derives from a trial court's wide discretion to control the course of litigation.  In the present case, however, this inherent discretion has been explicitly circumscribed by statute.  The plain language of both 18 U.S.C. § 981(g) and 21 U.S.C. § 881(i) requires a district court to find two elements in order to grant a stay: (1) that forfeiture proceedings be "related to" an offense for which there has been an indictment,[9] and (2) that the Government show "good cause" for the stay.  See In re Ramu, 903 F.2d 312, 319 (5th Cir. 1990) (considering appropriateness of stay in context of 21 U.S.C. § 881(i)).  Fifth Circuit precedent additionally mandates that a district court make express findings of fact and conclusions of law concerning the existence of the statutory prerequisites.  See Id.

The district court granted a stay of litigation until the conclusion of the Abrego trial on the basis of oral argument by both the Government and Massieu, as well as two sealed affidavits which the court examined *ex parte*.  Massieu argues that the district court's denial of his request for copies of the two

---

[9] 21 U.S.C. § 881(i) requires that the indictment be for a drug offense.  18 U.S.C. §981(g) mandates that the indicted offense be a violation of federal, state, or local law.

sealed affidavits deprived him of the opportunity to rebut meaningfully the contentions of the Government at the May 31, 1996, hearing.

It is well established in this Circuit that district courts have an inherent power to receive *in camera* evidence and place such evidence under seal.  See <u>United States v. De Los Santos</u>, 810 F.2d 1326, 1331-1333 (5th Cir. 1987).  In the criminal context, we have recognized that the receipt of evidence *ex parte* permits the court to balance the interests of the Government--in safeguarding its confidential informants and in ensuring viability of its ongoing investigations--against the interests of defendants in confronting adverse witnesses.  See <u>United States v. Singh</u>, 922 F.2d 1169, 1172 (5th Cir. 1991) (holding that district court's in camera review was appropriate, and that furnishing the appellant with a copy of the transcript of that review "would defeat the very purpose of the in camera procedure.").  Unlike criminal defendants, civil forfeiture claimants are not afforded the protections of the Sixth Amendment's Confrontation Clause.  See <u>Austin v. United States</u>, 509 U.S. 692, 608 n.4, 113 S.Ct. 2801, 2804 n.4 (1998).  As a result, submission of evidence *ex parte* is more readily justified in a civil forfeiture action than in a criminal case.

Because courts routinely balance the interests of the Government in anonymity against that of civil litigants in full disclosure and have permitted the submission of evidence *ex*

26

*parte*, see, e.g., <u>Abell v. Potomac Insurance Co.</u>, 858 F.2d 1104, 1143 (5h Cir. 1988), vacated on other grounds, 492 U.S. 914, 109 S.Ct. 3236 (1989) (sealing the record of in camera discussions with FBI agent about attempts to bribe jury members); <u>In re Grand Jury Witness</u>, 835 F.2d 437, 441 (2d Cir. 1988) (permitting Government to file a sealed *ex parte* affidavit and to adjourn to chambers for ex parte discussion in closed civil contempt hearing), we find no abuse of discretion in the present case.

Moreover, Massieu has not demonstrated any prejudice to his "substantial rights" that resulted from the imposition of the stay. <u>See</u> Fed.R. Civ.P Rule 61. In particular, it is interesting to note that less than one month after he unsuccessfully sought a writ of mandamus from this Court to be relieved of the hardship of what he deemed court-indulged blanket non-disclosure by the Government, Massieu moved the district court for a speedy trial. Upon agreement of the parties, the case was set for trial on March 10, 1997, approximately three months following the district court's lift of the stay.

3. <u>Failure to exclude testimony of last-minute witnesses</u>.

Massieu's next point of error is that the district court erred in failing to exclude the trial testimony of Cesar Dominguez[10] and Raul Macias,[11] who were two of the four

---

[10]Cesar Dominguez was a city policeman commissioned by the MFJP until 1995. As a police officer assigned to the MFJP, Dominguez would deliver "quotas" (payoffs in the form of either

prospective witnesses that the Government disclosed less than

five full days before trial.  According to Massieu, the last-

minute witness disclosure violated Federal Rule of Civil

---

cash or drugs) from drug traffickers to the MFJP office.  He testified that drug traffickers also delivered money to the office in boxes, briefcases, or bags.  The money was wrapped in cellophane or secured by rubber bands.  The most money Dominguez was involved in counting was a little more than $6 million.

Beginning in 1991, Dominguez began working for the Amado Carillo Fuentes organization.  In 1993, Dominguez on four different occasions transported money to the airport.  Once at the airport the money would be loaded onto a plane belonging to the Attorney General's office.  While Dominguez was a police officer, money continued to be brought to the airport destined for the Attorney General's office regardless of who held the position.  Dominguez quit in 1995 because over 17 of his co-workers were murdered.

[11]Raul Macias was a police officer in Mexico from 1989 to 1995.  In 1994, he was assigned to work under the direction of Commander David Grajeda Lara in Zacatecas, Mexico.  Macias testified that on August 4, 1994, an airplane loaded with cocaine landed at an airstrip near the city of Sombrerete, Mexico, where the cocaine was unloaded and taken to the local MFJP's office in two trucks.  At the office the cocaine was weighed.  Eight tons of the approximately 10 tons of cocaine were loaded into a truck and driven away by Commander Lara under escort.  The remaining two tons along with bricks of fake cocaine were taken elsewhere and burned the next day.

Macias returned to the airport that same night and observed approximately 15 Suburbans parked near the airport entrance.  Lara instructed Macias to load 12-15 suitcases into Lara's Suburban.  While guarding two of the suitcases at a hotel that night, Macias opened the suitcases and saw that they contained United States Currency in denominations of 50's, 20's, and 10's.

The following day, Lara picked up Macias, the suitcases, two other agents and they went to Mexico City.  The next morning the men drove to the offices of the MFJP where Lara began talking to the passenger of a blue Marquis.  Lara signaled to Macias, who took the suitcases with the currency from the Suburban and placed them in the trunk of the Marquis.  Macias recognized the passenger who Lara was speaking with in the blue Marquis as Massieu.

28

Procedure 26(a)(3)(A)[12] and should have prompted mandatory exclusion under Rule 37. Specifically, he complains that the late disclosure forced inadequate depositions of other witnesses and precluded investigation of the witnesses' allegations as well as development of impeachment and rebuttal testimony.

Federal Rule of Civil Procedure 37(c)(1) provides that a party who "without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R. Civ.P. 37(c)(1). In determining whether a violation of Rule 26(a) or (e)(1) is harmless, the trial court's discretion is to be guided by the consideration of four factors: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to identify the witness. See Bradley v. United States, 866 F.2d 120, 125 (5th Cir. 1989).

We uphold the district court's decision not to exclude the witness testimony. First, the applicable standard of review for

---

[12]According to Rule 26(a)(3)(A), a party shall provide to other parties the name, address, and telephone number of each witness that it may present at trial other than solely for impeachment purposes, "separately identifying those whom the party expects to present and those whom the party may call if the need arises . . . ." Fed.R. Civ.P. Rule 26(a)(3)(A).

29

a trial court's decision in a matter relating to discovery is abuse of discretion. See Harris v. Amoco Production Co., 768 F.2d 669, 684 (5th Cir. 1985). We will not substitute our judgment for that of Judge Atlas; instead, we must only decide whether the district court "could have entered the order which [it] did." See id. Second, neither Rule 37 and the Advisory Committee Notes to Rule 37 nor Fifth Circuit case law requires that a district court make express findings of fact or conclusions of law concerning the existence of substantial justification or harmless failure to disclose. Accordingly, Judge Atlas' statements in open court on March 10, 1997, regarding witness safety concerns and minimal prejudice as well as the reasons asserted by the Government in justification for its three week delay in providing the discovery, which was nonetheless disclosed in advance of trial, are sufficient to support the district court's determination that Rule 37 sanctions were not in order.[13]

### 4. Failure to bifurcate the trial.

A motion to bifurcate "is a matter within the sole discretion of the trial court, and we will not reverse the court's decision absent an abuse of that discretion." First Tex.

---

[13]Before the district court, the Government justified its tardy disclosure of Cesar Dominguez and Raul Macias as follows: (1) the loss of anticipated trial witnesses as a result of the leaked "Processo" story and (2) the difficulty in arranging the lawful entrance of Dominguez and Macias, both Mexican citizens, into the United States.

<u>Sav. Ass'n v. Reliance Ins. Co.</u>, 950 F.2d 1171, 1174 n.2 (5th Cir. 1992).  Massieu asserts that the district court abused its discretion when it failed to bifurcate the proceeding into a bench trial to determine probable cause and a subsequent jury trial on defenses to the forfeiture.  Massieu argues that, as a result of the one proceeding, hearsay evidence offered to show probable cause was placed before the jury.  According to Massieu, the admission of this otherwise inadmissible evidence was highly prejudicial and deprived him of a fair trial.

Massieu's argument is without merit.  Judge Atlas restricted hearsay before the jury to only those instances where an exception under Rules 803 or 804 of the Federal Rules of Evidence applied.  All hearsay, which was not otherwise admissible but for purposes of probable cause, was heard outside the presence of the jury.  Accordingly, the district court's failure to bifurcate Massieu's forfeiture proceeding was not an abuse of discretion.

### 5.  0 + 0 + 0 + 0 =0

In order for cumulative error analysis to apply, Massieu must have " . . . [some]thing to cumulate." <u>Derden v. McNeel</u>, 938 F.2d at 609.  Because the foregoing analysis has revealed no ground for reversal, he has nothing to cumulate.  Accordingly, we deny Massieu relief on his cumulative due process claim.

### E.  Admissibility of Ortiz and Iglio Testimony

Massieu additionally claims that the district court erred in admitting the testimony of two witnesses: Government informant "Tony" Ortiz and money laundering expert Agent Vincent Iglio. Evidentiary rulings are accorded considerable deference on appeal; "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Fed.R. Evid. 103(a); see General Electric Co. v. Joiner, 118 S.Ct. 512 (1997); Mills v. Beech Aircraft Corp., 886 F.2d 758 (5th Cir. 1989). We first examine the testimony of Tony Ortiz.

### 1. Testimony of Tony Ortiz

Massieu argues that the district court erred by failing to exclude "Tony" Ortiz's testimony and that the admission of such testimony invited the conclusion that all Mexican law enforcement officials are corrupt. Specifically, he asserts that Ortiz's testimony was irrelevant and unfairly prejudicial. See Fed.R. Evid 402 and 403.

At trial, Ortiz testified about the payment of drug proceeds to Mexican officials for the purpose of facilitating the movement of cocaine through Mexico into the United States. He explained that he had joined the Juan Garcia Abrego drug trafficking organization in 1989 and had been in charge of a transportation arm of the organization until his arrest in 1993. According to Ortiz, his job included responsibility for transporting cocaine from Brownsville to Houston and then to New York as well as

responsibility for transporting the drug proceeds from the United States to Matamoros, Mexico.

Ortiz also testified that his ability to move drugs without incident in Mexico depended upon paying commandants and other Mexican officials.  He testified that there were times that he would have to wait for cocaine to arrive in Brownsville because the commandants of the district had not yet been paid.  According to Ortiz, when commandants changed, payment would not stop.  Other arrangements would be made.  As to the mode of payment, Ortiz explained that commandants would be paid from the drug proceeds which Ortiz would collect in the United States.  He testified that he knows that Abrego continued to move cocaine after Ortiz's arrest and that the only way to stay in business was to pay bribes "all the way to the top."

Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed.R. Evid. 401.  Rule 403, however, provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."  Fed.R. Evid. 403.  In <u>United States v. Pace</u>, 10 F.3d 1106, 1115-16 (5th Cir. 1993), the Fifth Circuit explained, however, that "[u]nless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the

33

occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." Id.

There is no doubt that the testimony of Tony Ortiz was relevant to the forfeiture proceeding. Under 18 U.S.C. § 981(a)(1), the seized currency would be forfeitable if it was involved in a transaction violating 18 U.S.C. § 1956. With regard to § 1956(a)(2)(A), the Government must demonstrate that there was a transportation or transfer or attempt to transfer "monetary instruments or funds from a place . . . outside the United States to a place inside the United States with the intent to promote the carrying on of specified unlawful activity." Ortiz's testimony was relevant to whether money and cocaine readily flowed between Mexico and the United States and that some Mexican officials were given pay-offs in order to facilitate narcotics trafficking. Additionally, Ortiz provided first-hand knowledge about the operation of the Abrego drug organization-- one of the groups from which the Government alleged Massieu received pay-off money. In order for the district court to properly find Ortiz's testimony to be relevant, it was not necessary for Ortiz to provide the conclusive link between Abrego and Massieu.

Furthermore, Ortiz's testimony was not so unfairly prejudicial that it should have been excluded. In conducting an

inquiry into the prejudicial effect of contested testimony, we have recognized that "[t]estimony presented by the Government will invariably be prejudicial to a criminal defendant or forfeiture claimant. But Rule 403 only excludes evidence that would be unfairly prejudicial to the defendant." United States v. Townsend, 31 F.3d 262, 270 (5th Cir. 1994). While there is no doubt that Tony Ortiz's testimony was harmful to Massieu, its prejudicial effect did not substantially outweigh its probative value.

For the reasons stated above in analyzing the relevance of Ortiz's testimony, the district court properly found that it was not unfairly prejudicial.

### 2. Testimony of Vincent Iglio.

Claimant next argues that the district court erred by admitting the testimony of Vincent Iglio as an expert on money laundering. Massieu does not contest Iglio's qualifications to testify as an expert, rather he asserts that Iglio's testimony constituted inadmissible legal conclusion. See Fed.R. Evid 702 and 704.

The admission or exclusion of expert testimony will not be disturbed on appeal unless it is "manifestly erroneous." First Natl. Bank of Durant v. Trans Terra Corp. Intl., 142 F.3d 802, 811 (5th Cir. 1998). Rule 702 of the Federal Rules of Evidence states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert by knowledge, skill experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R. Evid. 702. With regard to the permissible scope of expert testimony, Rule 704 explicitly provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R. Evid. 704. This Court, however, has repeatedly held that Rule 704 does not allow an expert to render conclusions of law. See Snap-Drape, Inc. v. Commissioner of Internal Revenue, 98 F.3d 194 (5th Cir.1996).

Massieu charges that Iglio's statement to the jury--that the testimony he had heard so far in the case was consistent with money laundering--supplanted Iglio's judgment for their own. Where an expert's trial testimony included the bases for the expert's conclusion, and the conclusion was supported by the overwhelming evidence, as is true in the present matter, Fifth Circuit case law supports a determination that there was not significant risk that the expert's testimony "supplant[ed the] jury's independent exercise of common sense." United States v. Willey, 57 F.3d 1374, 1389 (5th Cir. 1995) (quoting Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir.1986)). We find no error in allowing Iglio's testimony.

Cases from the Fourth and Eighth circuits bolster the determination that the district court properly allowed Agent

Iglio to testify. The Fourth and Eighth Circuits when confronted with the admissibility of expert testimony on questions involving money laundering each found that such testimony was admissible and did not present problems of experts acting as an additional juror. See United States v. Barber, 80 F.3d 964 (4th Cir. 1995) (noting that the district court did not abuse its discretion in allowing the Government's agent to testify and explain how the defendant's activities constituted concealment for purposes of money laundering); United States v. Acty, 969 F.2d 652 (8th Cir. 1992), aff'd on other grounds, 511 U.S. 513, 114 S.Ct. 1747 (1994) (admitting, as permissible under rule 704(a), expert testimony that deposited checks affect interstate commerce under § 1956(a)(1)(B), that banks into which defendant deposited money were financial institutions under statute and that defendant's activities constituted concealment of money under § 1956(a)(1)(B)). Accordingly, we hold that the district court properly admitted the expert testimony of Agent Vincent Iglio.

CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

37